IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NARRATIVE SCIENCE INC., <br><br> Plaintiff, <br><br> v. <br><br> QUILLBOT, INC., <br><br> Defendant. | No. 20-cv-5684 <br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT FOR WILLFUL TRADEMARK INFRINGEMENT**

Plaintiff Narrative Science Inc. states as follows for its Complaint for Willful Trademark Infringement against Defendant QuillBot, Inc.:

**Introduction**

1. Plaintiff Narrative Science Inc. is a Chicago-based company that began as a start-up venture at Northwestern University. It is now a leader in artificial intelligence ("AI") natural language generation technology. Since 2012, Plaintiff has advertised, marketed, offered for sale and sold an AI-based natural language generation platform called "Quill" that takes certain inputted data and generates natural language narratives from the data. As this technology proved useful and popular, over time Plaintiff developed its "Quill" platform such that it could be used with many different types of inputted data in order to generate natural language narratives for myriad uses. Plaintiff ultimately developed a line of "Quill"-branded products and services, including Quill™, Quill Engage™, Quill Connect™, and Quill for Tableau™.

2. Defendant QuillBot, Inc. is also a Chicago-based company. In 2017 – five years after Plaintiff began using its "Quill" mark – Defendant began offering an AI-based natural language generation software product called "QuillBot." Like Plaintiff's "Quill" line of products,

Defendant's "QuillBot" product takes certain inputted data and converts that data into natural language narratives.

3. When Plaintiff learned of Defendant's infringing use of "QuillBot,' Plaintiff immediately objected. Plaintiff also filed an opposition in the United States Patent and Trademark Office to stop Defendant from obtaining a federal registration for its infringing "QUILLBOT" trademark.

4. Defendant did not cease its infringement in response to Plaintiff's objection. Instead, Defendant changed its corporate name from "Keuji Co." to "QuillBot, Inc." and prominently used even just "Quill" by itself (*i.e.*, without the "bot") to promote its products.

5. As a result, Defendant is now using the infringing "Quill" and "QuillBot" marks to offer a product that takes certain inputted data and uses that data to generate natural language narratives, just as Plaintiff's "Quill" line of products takes inputted data and uses it to generate natural language narratives.

6. The consumer confusion and trademark infringement caused by Defendant's conduct is further heightened because Defendant's "QuillBot" product is likely to be mistakenly viewed as another extension of Plaintiff's "Quill" product line. Over the past eight years, Plaintiff has offered a suite of "Quill" products – *e.g.*, Quill Connect™ for generating natural language narratives from Twitter data, Quill Engage™ for generating natural language narratives from Google Analytics data, and Quill for Tableau™ for generating natural language narratives from dynamic data – and the consuming public is likely to mistakenly believe that "QuillBot" is another one of Plaintiff's "Quill" products designed for generating natural language narratives from inputted text data.

7. Furthermore, Defendant's QuillBot is known to be used for plagiarism – as acknowledged by the prior name for Defendant's QuillBot being "Plaigy" (*i.e.*, short for "plagiarism) – which causes additional harm to Plaintiff.

8. Because Defendant is using the identical (QUILL) and highly similar (QUILLBOT) marks as Plaintiff, confusion is inevitable and has already occurred. And while Defendant's infringement is nationwide, the harm caused by Defendant is further exacerbated because Defendant has set up shop in downtown Chicago, just blocks from where Plaintiff is headquartered.

9. Plaintiff seeks treble damages and injunctive relief to stop Defendant's willful infringement of Plaintiff's QUILL mark.

**Parties**

10. Plaintiff is a Delaware corporation with its principle place of business located at 1 North Dearborn St., Chicago, Illinois 60602.

11. Defendant is a Florida corporation with its principle place of business located at 401 North Michigan Avenue, Chicago, Illinois 60611.

**Jurisdiction and Venue**

12. This Court has original subject matter jurisdiction over Count I of this action under 28 U.S.C. §§ 1331 and 1338 because the claims arise out of the Lanham Act under 15 U.S.C. § 1125. This Court has supplemental jurisdiction over Plaintiff's remaining claims pursuant to 28 U.S.C. § 1367(a) because they are so related to the claims asserted in Count I as to form part of the same case or controversy.

13. This Court has personal jurisdiction over Defendant because Defendant's principal place of business is in this district.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this district and is subject to personal jurisdiction in this district, and a substantial part of the events giving rise to the claims (*i.e.,* Defendant's trademark infringement) occurred in this district.

**Factual Background**

I. **Plaintiff's QUILL™ Product and Trademark**

15. Founded in 2010, Plaintiff has operated as an AI company for over a decade, using technology and analytics to provide AI-based products and services to customers.

16. Plaintiff offers various AI-based products and services; with all of them, data is input into a proprietary algorithm, and the algorithm generates natural language narratives based on the inputted data.

17. One of Plaintiff's core AI-based offerings is **Quill™** – a natural language generation platform that takes certain inputted data and generates natural language narratives based on the inputted data.

18. Plaintiff's Quill platform is used as a natural language generation engine in various of Plaintiff's "Quill"-branded product offerings, each of which, ultimately, takes some set of inputted data and then, via Quill, outputs a natural language narrative based on the inputted data.

19. For example, Quill Connect™ would take data from Twitter and then Quill would generate a narrative summary based on that Twitter data.

20. As another example, Quill Engage™ would take data from a user of Google Analytics and then Quill would generate a natural language narrative based on that Google Analytics data.

21. As another example, Quill for Tableau™ takes dynamic data and then Quill generates a natural language narrative based on the dynamic data.

22. As such, U.S. customers have come to understand that the trademark QUILL relates to, among other things, AI-based natural language generation resulting from varying types of inputted data.

23. Plaintiff has continuously used QUILL in connection with its natural language generation products and services since at least as early as 2012.

24. QUILL has been used in interstate commerce in the United States for the purpose of identifying Plaintiff's products and distinguishing them from the products of others.

25. Plaintiff has expended significant resources developing, advertising, marketing, and promoting its Quill platform and products and QUILL brand throughout the United States.

26. As a consequence of Plaintiff's continuous use of QUILL in connection with its natural language generation products and services throughout the United States, and due to the significant investment of time, money, effort, widespread sales, and popularity of the product, Plaintiff's QUILL mark has acquired value and is well-known to the consuming public and trade as identifying and distinguishing the source of Plaintiff's products and services.

II. **Defendant's Willfully Infringing Conduct**

27. In December 2017 – many years after Plaintiff established itself as a leader in natural language generation products and services, and long after Plaintiff's Quill platform, products, and brand were well established in the marketplace – Defendant began offering a natural language generation product called "QuillBot."

28. Defendant's QuillBot generates a natural language narrative based on data inputted by a user of the product.

29. As seen in the following image, in Defendant's "QuillBot" product, a user may enter certain data (text) into the text box and then press "*Quill* It," and Defendant's "QuillBot" product generates a natural language narrative output for the user.



30. As can be seen in the image above, Defendant is not only using "QuillBot" as its tradename and product name, but has even begun using "Quill" alone as a brand identifier, which is identical to Plaintiff's QUILL mark.

31. Defendant's infringing trademark use has caused actual confusion.

### Defendant's Actions Confirm Defendant's Infringement Is Willful

32. On January 29, 2019, Defendant filed an application to register the trademark QUILLBOT with the United States Patent and Trademark Office (the "USPTO"). This application was assigned U.S. Serial No. 88281259.

33. On February 27, 2019, Plaintiff objected to Defendant's use of "QuillBot," and demanded that Defendant stop infringing Plaintiff's "Quill" mark and abandon its pending "QuillBot"

trademark application before the USPTO. *See* Exhibit A. Defendant refused to comply with Plaintiff's request.

34. On June 25, 2019, the USPTO published Defendant's QUILLBOT application for opposition. That same day, Plaintiff filed a 90-day request for extension of time to oppose Defendant's QUILLBOT application.

35. On October 23, 2019, Plaintiff timely filed a Notice of Opposition in the USPTO against Defendant's QUILLBOT application. That Opposition is pending.[1]

36. Plaintiff's hope was that the Opposition in the USPTO would lead Defendant to adopt a non-infringing trademark without the need for federal court action. But unfortunately, Defendant has seemingly taken the opposite approach and continued, and possibly even increased, its infringement.

37. After Plaintiff filed its Opposition in the USPTO against Defendant's attempt to register "QuillBot," Defendant changed its corporate name from Keuji Co. to QuillBot, Inc.

38. Despite being aware of Plaintiff's QUILL trademark, upon information and belief, Defendant revamped its website and prominently uses "Quill" by itself more than it did prior to Plaintiff filing the Notice of Opposition.

---

[1] Plaintiff intends to move to stay the Opposition during the pendency of this federal court action.



39. Thus, after learning of Plaintiff's objections to Defendant's "QuillBot" application, Defendant continued its infringement and even seemingly used "Quill" alone more than before.

40. Defendant's willful infringement of Plaintiff's trademark rights is apparent.

### Defendant's "QuillBot" Product Further Harms Plaintiff Because Defendant Admits "QuillBot" Is Used To Plagiarize

41. Upon information and belief, Defendant's "QuillBot" is sometimes used to disguise plagiarism.

42. Defendant acknowledges this on its website:

> **Can I use QuillBot for Plagiarism?**
>
> QuillBot was **not meant for plagiarism** and we do not condone its use for that purpose. You should only submit original work into QuillBot, and there are no guarantees copied material will pass a plagiarism detector. Do not plagiarize using QuillBot.

43. While Defendant apparently attempts to keep an arms-length distance from the unethical conduct of plagiarism by stating QuillBot was not "meant" for plagiarism and to "not plagiarize using QuillBot," Defendant also curiously includes something of a "product disclaimer" for QuillBot stating that "there are no guarantees material will pass a plagiarism detector."

8

44. Further illustrating an intended use of QuillBot, upon information and belief, Defendant previously called its "QuillBot" service "Plaigy." As in, short for "plagiarism."

45. Regardless of whether Defendant intends QuillBot to be a product meant to disguise plagiarism or if users simply started using it for that purpose, Defendant acknowledges that QuillBot may be used for the purpose of plagiarism.

46. Plaintiff prides itself on the reputation and goodwill it has built for itself, which has been recognized by the industry in numerous articles and publications[2], including for using its "Quill" platform to aid the country during the COVID-19 pandemic[3]:

> Born out of Northwestern University's journalism and computer science programs, Narrative Science has been producing stories like these for about 10 years. The platform has two AI-enabled products: Quill and Lexio. Quill uses natural language generation software to embed stories natively into a client's dashboard. Lexio turns a company's data into digestible narratives that users can simply scroll through as if they were looking at a newsfeed. Both of these tools were used to produce the coronavirus content.
>
> So far, the company has published five stories, covering a variety of subjects including COVID-19 recoveries versus fatalities and the increase in cases organized by country. Going forward, Platt says Narrative Science plans to produce more stories about testing rates and he hopes to generate more granular analyses, going beyond just comparing countries and states. However, a lot of this depends on the quality of the data.
>
> At the end of the day, Narrative Science's mission is to help everyone make sense of all this data, providing digestible content with no agenda.

---

[2] *See, e.g.* https://narrativescience.com/newsroom
[3] https://www.builtinchicago.org/2020/03/26/narrative-science-covid19-stories

47. Plaintiff is irreparably harmed by the association of its QUILL brand with a product used for the unethical conduct of plagiarism.

## COUNT I
## WILLFUL TRADEMARK INFRINGEMENT – 15 U.S.C. § 1125

48. Plaintiff incorporates herein by reference the allegations of paragraphs 1 through 47 as though fully stated herein.

49. Section 1125(a) of the Lanham Act precludes use in commerce of any word, term, or name likely to cause confusion as to the affiliation, connection or association as to the origin or sponsorship of goods or services by another person.

50. Through extensive and continuous use of its QUILL trademark in connection with natural language generation products and services since as early as 2012, Plaintiff has established trademark rights in QUILL.

51. Defendant's unauthorized use of QUILLBOT and QUILL in connection with natural language generation products and services is likely to cause, and already has caused, confusion, mistake, or deception among consumers as to the source, quality, affiliation, sponsorship or authenticity of the parties' goods and/or services—depriving Plaintiff of the goodwill established in its QUILL trademark.

52. On information and belief, Defendant deliberately adopted and/or is using QUILLBOT and QUILL with a bad faith intent to cause consumer confusion and/or trade on the goodwill established by Plaintiff since 2012.

53. Defendant's use of QUILLBOT and QUILL in connection with its natural language generation products and services has caused and, unless retrained and enjoined, will continue to cause consumer confusion and irreparable harm, damage and injury to Plaintiff for which Plaintiff has no adequate remedy at law.

54. Defendant's willful and continued use of QUILLBOT and QUILL, after having notice of Plaintiff's QUILL trademark and multiple requests by Plaintiff to cease all use of the marks, makes this case an exceptional case for which an award of Plaintiff's reasonable attorneys' fees and costs are warranted.

## COUNT II
## ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT – 815 ILCS 510

55. Plaintiff incorporates herein by reference the allegations of paragraphs 1 through 47 as though fully stated herein.

56. Section 510/2 of the Illinois Uniform Deceptive Trade Practices Act provides in relevant part:

> A person engages in a deceptive trade practice when, in the course of his or her business…the person:
>
> (1) passes off goods or services of those of another;
> (2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;
> (3) causes likelihood of confusion or of misunderstanding as to the affiliation, connection or association with or certification by another,…or
> (12) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

815 ILCS 510/2.

57. Defendant's unauthorized use of QUILLBOT and QUILL in connection with natural language generation products and services, is likely to cause, and already has caused, confusion, mistake, or deception among consumers as to the source, quality, affiliation, sponsorship or authenticity of the parties' goods and/or services—depriving Plaintiff of the goodwill established in its QUILL trademark. Therefore, Defendant has used deceptive acts or practices as described in Section 2 of the Uniform Deceptive Trade Practices Act.

11

58. On information and belief, Defendant deliberately adopted and/or is using QUILLBOT and QUILL with a bad faith intent to cause consumer confusion and/or trade on the goodwill established by Plaintiff since 2012.

59. Defendant's use of QUILLBOT and QUILL in connection with natural language generation products and services has caused and, unless retrained and enjoined, will continue to cause consumer confusion and irreparable harm, damage and injury to Plaintiff for which Plaintiff has no adequate remedy at law.

## COUNT III
## ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

60. Plaintiff incorporates herein by reference the allegations of paragraphs 1 through 47 as though fully stated herein.

61. Section 505/2 of the Illinois Consumer Fraud and Deception Business Practices Act provides:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to…the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person in fact has been misled, deceived or damaged thereby.

815 ILCS 505/2.

62. Defendant's unauthorized use of QUILLBOT and QUILL in connection with natural language generation products and services is likely to cause, and already has caused, confusion, mistake, or deception among consumers as to the source, quality, affiliation, sponsorship or authenticity of the parties' goods and/or services—depriving Plaintiff of the goodwill established in its QUILL trademark. Therefore, Defendant has used deceptive acts or practices as described in Section 505/2 of the Illinois Consumer Fraud and Deception Business Practices Act and Section 2 of the Uniform Deceptive Trade Practices Act.

63. On information and belief, Defendant deliberately adopted and/or is using QUILLBOT and QUILL with a bad faith intent to cause consumer confusion and/or trade on the goodwill established by Plaintiff since 2012.

64. Defendant's use of QUILLBOT and QUILL in connection with natural language generation products and services has caused and, unless retrained and enjoined, will continue to cause consumer confusion and irreparable harm, damage and injury to Plaintiff for which Plaintiff has no adequate remedy at law.

## COUNT IV
## COMMON LAW TRADEMARK INFRINGEMENT

65. Plaintiff incorporates herein by reference the allegations of paragraphs 1 through 47 as though fully stated herein.

66. Through extensive and continuous use of QUILL since as early as 2012, Plaintiff has established trademark rights in QUILL.

67. Defendant's unauthorized use of QUILLBOT and QUILL in connection with its sale of natural language generation goods and services is likely to cause, and already has caused, confusion, mistake, or deception among consumers as to the source, quality, affiliation, sponsorship or authenticity of the parties' goods and/or services—depriving Plaintiff of the goodwill established in its QUILL trademark.

68. On information and belief, Defendant deliberately adopted and/or is using QUILLBOT and QUILL with a bad faith intent to cause consumer confusion and/or trade on the goodwill established by Plaintiff since 2012.

69. Defendant's use of QUILLBOT and QUILL in connection with natural language generation goods and services has caused and, unless retrained and enjoined, will continue to cause

consumer confusion and irreparable harm, damage and injury to Plaintiff for which Plaintiff has no adequate remedy at law.

## COUNT V
## CYBERSQUATTING – 15 U.S.C. § 1125(d)

70. Plaintiff incorporates herein by reference the allegations of paragraphs 1 through 47 as though fully stated herein.

71. Defendant's domain name QuillBot.com is not only confusingly similar to Plaintiff's QUILL mark, but it fully incorporates the identical term QUILL.

72. At the time Defendant registered and/or commenced usage of the domain name QuillBot.com, Plaintiff's QUILL mark was distinctive and well-known.

73. Plaintiff believes, and thereon alleges, that Defendant registered, trafficked in, and used the domain name QuillBot.com with the bad faith intent to profit from Plaintiff's QUILL mark.

74. The actions and conduct of Defendant complained of herein constitute cybersquatting in violation of the Lanham Act under 15 U.S.C. § 1125(d), and will, unless enjoined, damage the value of Plaintiff's QUILL mark and Plaintiff's reputation and goodwill.

75. Defendant is causing irreparable injury and Plaintiff has no adequate remedy at law.

**Prayer for Relief**

WHEREFORE, Plaintiff prays that this Court enter judgment against Defendant as follows:

a) Preliminary and permanently enjoining Defendant's use of QUILLBOT and QUILL as a product name, tradename, trademark, service mark or domain name;

b) Order Defendant to surrender to Plaintiff the QuillBot.com domain name and any domain name registrations relating thereto;

c) Award Plaintiff damages resulting from Defendant's infringement of Plaintiff's protectable trademark rights;

d) Order an accounting for all gains, profits, and advantages derived from Defendant's acts of infringement of Plaintiff's trademarks pursuant to 15 U.S.C. § 1117;

e) Find the case to be exceptional and award appropriate relief thereunder;

f) Find that Defendant willfully infringed Plaintiff's trademark and must pay Plaintiff enhanced damages due to Defendant's willful infringement;

g) Award damages and injunctive relief pursuant to 815 ILCS 510/3;

h) Award Plaintiff its reasonable attorneys' fees;

i) Award Plaintiff interest and costs;

j) Defendant must report to this Court of its compliance with the foregoing within thirty (30) days of judgment; and

k) Ordering or awarding Plaintiff any such other relief that the Court deems just and proper under the circumstances.

## Demand For Jury Trial

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 24, 2020

Respectfully submitted,

By: /s/ Michael Parks
Michael A. Parks. IL 6217230
Sartouk H. Moussavi, IL 6313554
THOMPSON COBURN LLP
55 E. Monroe Street, 37th Floor
Chicago, IL 60603
P: (312) 346-7500
F: (312) 580-2201
mparks@thompsoncoburn.com
smoussavi@thompsoncoburn.com